**John P. LOWE, Jr., Plaintiff,**

v.

**SALOMON SMITH BARNEY, INC., Defendant.**

**No. 01–CV–6429L.**

United States District Court, W.D. New York.

June 3, 2002.

John P. Lowe, Jr., Honeoye Falls, NY, pro se.

Carolyn G. Nussbaum, Nixon Peabody, LLP, Rochester, NY, Richard Rosen, Claudia Hammerman, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Defendants.

## DECISION AND ORDER

LARIMER, Chief Judge.

Plaintiff, John P. Lowe, appearing *pro se*,[1] filed the complaint in this action on September 1, 2001, alleging claims under federal and New York law for securities fraud. Defendants, Salomon Smith Barney, Inc. ("SSB") and B. Alex Henderson ("Henderson"), have moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## BACKGROUND

The complaint alleges the following facts, which must be accepted as true for the purposes of deciding the motion to dismiss. At all times relevant to the complaint, plaintiff held 13,680 shares of common stock of Nortel Networks Corp. ("Nortel"), in an account with SSB. Defendant Henderson has been employed by SSB as a Managing Director in equity research since June 29, 2000, and is an analyst in the telecommunications equipment sector. As part of his duties, Henderson assumed coverage of Nortel for SSB in July 2000. Complaint ¶ 7.

Plaintiff alleges that Henderson's recommendations, articulated through his own research reports and the advice of Alfred F. Kelly, Jr., the SSB broker on plaintiff's account, caused plaintiff to hold his Nortel shares to his detriment. Plaintiff alleges that defendants knowingly misrepresented

that the outlook for Nortel stock was favorable, and that they were motivated to do so by a desire to obtain investment banking fees from Nortel and to "condition the market" to accept Nortel securities that SSB was planning to underwrite. In January 2001, SSB acted as co-lead underwriter of a $2.5 billion debt and equity offering for Nortel.

Plaintiff further alleges that SSB failed to inform plaintiff that, contrary to traditional practice in the brokerage industry, SSB no longer maintained an "ethical screen" or "Chinese wall" between its research analysts and its investment bankers, in order to ensure that its analysts' recommendations would not be influenced by SSB's own business interests.

Because of these acts and omissions on the part of defendants, plaintiff alleges, he continued to hold his Nortel shares, the value of which declined from $86 a share on July 26, 2000 to $6 a share on September 4, 2001. The total value of plaintiff's Nortel shares declined by over $1 million.

Based on these allegations, plaintiff asserts six causes of action, all based on plaintiff's allegation that Henderson knowingly made false and misleading statements about Nortel's prospects, which led plaintiff to hold rather than sell his Nortel shares. The first four causes of action allege violations of, respectively, § 9(e) of the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C. § 78i; § 10(b) of the Act and Rule 10b–5, 17 C.F.R. § 240.10b–5; § 15(c) of the Act, 15 U.S.C. § 78o; and § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). The fifth cause of action asserts a claim for fraud and misrepresentation

---

1. Plaintiff states in his memorandum of law that he is admitted to practice law in New York and is a practicing business lawyer.

under New York law. The sixth cause of action asserts a claim for breach of fiduciary duty, also under New York law.

## DISCUSSION

### I. Claim under § 15(c) of the Act

Plaintiff's third cause of action asserts a claim under § 15(c) of the Act, 15 U.S.C. § 78o. The Second Circuit, however "has held that there is no private right of action under § 15(c)(1)." *Boguslavsky v. Kaplan,* 159 F.3d 715, 722 n. 6 (2d Cir.1998) (citing *Asch v. Philips, Appel & Walden, Inc.,* 867 F.2d 776, 777 (2d Cir.) (per curiam), *cert. denied,* 493 U.S. 835, 110 S.Ct. 114, 107 L.Ed.2d 75 (1989)).

Plaintiff himself apparently concedes that *Asch* bars his claim, since he contends that "the holding of *Asch* should be reconsidered in this Circuit." Plaintiff's Memorandum of Law at 9. This Court, however, is bound to follow Second Circuit precedent, and I have no discretion to "reconsider" decisions of the Court of Appeals. Plaintiff's third cause of action must therefore be dismissed.

### II. Claim under § 9 of the Act

■ Defendant contends that plaintiff lacks standing to assert claims under §§ 9(e) and 10(b) of the Act, and under Rule 10b–5, because plaintiff does not allege that defendants' alleged misrepresentations were connected with the purchase or sale of any security by plaintiff. Defendant maintains that plaintiff's allegation that he continued to *hold* securities that he already owned is not enough to give rise to a claim under any of these provisions.

Section 9(a) of the Act, 15 U.S.C. § 78i(a), makes it "unlawful for any person, ... [f]or the purpose of creating a false or misleading appearance of active trading in any security registered on a national securities exchange, or a false or misleading appearance with respect to the market for any such security," to engage in certain deceptive practices, in order to "induce the purchase or sale of any security...." Section 9(e), 15 U.S.C. § 78i(e), creates a private right of action, making any person who violates § 9 "liable to any person who shall purchase or sell any security at a price which was affected by such act or transaction ..." on the part of the defendant. Thus, "the cause of action expressly established by § 9(e) runs in favor of both those who *purchase* and *sell* stock at a price affected by a manipulative transaction." *Crane Co. v. American Standard, Inc.,* 603 F.2d 244, 252 (2d Cir. 1979) (emphasis added).

The complaint here does not allege that plaintiff purchased or sold his Nortel securities at a price which was affected by defendants' alleged activities. Plaintiff alleges only that he "held his Nortel shares to his detriment," Complaint ¶ 20, because their price per share has declined while he has continued to hold the shares.

That is not enough to state a claim. It has long been held that ¶ 9(e) does *not* apply where there is no allegation that the plaintiff has either bought or sold stock at a price that was affected by defendants' actions. *See, e.g., Chemetron Corp. v. Business Funds, Inc.,* 682 F.2d 1149, 1161–62 (5th Cir.1982) (§ 9(a), as enforced through § 9(e), requires action for the purpose of inducing a sale or purchase of a security on which the plaintiff relied and which affected the plaintiff's purchase or selling price), *rev'd on other grounds,* 460 U.S. 1007, 103 S.Ct. 1245, 75 L.Ed.2d 476 (1983); *Atlantic Fed. Savings & Loan v. Dade Savings & Loan,* 592 F.Supp. 1089, 1092 (S.D.Fla.1984) (§ 9(a) requires a purchaser or seller); *Richardson v. Shearson/American Express Co.,* 573 F.Supp. 133, 135–36 (S.D.N.Y.1983) (failure to allege purchase or sale of stock precludes

§ 9 action); *Copperweld Corp. v. Imetal,* 403 F.Supp. 579, 595 (W.D.Pa.1975) ("Section 9(e) unequivocally states that one shall purchase or sell the security before that person can assert the liability of another under subsection a"); *duPont v. Wyly,* 61 F.R.D. 615, 630 (D.Del.1973) (same).

Here, there is no allegation that plaintiff was induced to buy Nortel stock because of defendants' actions, or that the price at which he bought his shares was affected by defendants' activities. There is also no allegation that plaintiff has ever sold his Nortel shares. The only allegation, which is repeated throughout the complaint, is that plaintiff continued to hold shares that he already owned, apparently based on defendants' reports and advice. *See* Complaint ¶ 5 ("Plaintiff ... has at all times relevant to this complaint held 13,680 shares of Common Stock of Nortel ... in an account with defendant Salomon Smith Barney"); ¶ 10 ("the recommendations of defendant Henderson ... caused plaintiff to hold his Nortel shares to his detriment"); ¶ 17 ("Plaintiff continued to hold his Nortel shares because of [sic] he was advised to do so by defendants"); ¶ 20 ("As a result of the defendants' dissemination of the materially false and misleading information and failure to disclose material facts as alleged herein, plaintiff held his Nortel shares to his detriment"); *see also* Complaint ¶ 21 ("Had plaintiff known the truth of the defendants' fraudulent scheme, plaintiff would have sold his Nortel shares").

Because the complaint fails to allege that plaintiff ever purchased or sold any security at a price which was affected by defendants' allegedly improper conduct, his first cause of action, which asserts a claim under § 9, must be dismissed. *See Richardson,* 573 F.Supp. at 136 ("plaintiffs do not claim that they purchased or sold Nucorp stock at a price that was affected

by Von Nessi's alleged violation of section 9. Rather, they assert that Von Nessi's conduct induced them not to sell the stock. For this reason alone, Count IV [alleging violations of § 9] must be dismissed").

### III. Claim under § 10(b) of the Act and Rule 10b–5

■ For similar reasons, plaintiff's claims under § 10(b) and Rule 10b–5 must be dismissed. Section 10(b) makes it unlawful for and person "[t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Similarly, Rule 10b–5 makes it unlawful for any person

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

Like § 9, then, § 10(b) and Rule 10b–5 require some connection between the alleged violation and either the purchase or sale of a security. "It is well established that mere retention of securities in reliance on material misrepresentations or omissions does not form the basis for a § 10(b) or Rule 10b–5 claim." *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1443 (5th Cir.1993) (citing *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S.

723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), and *Abrahamson v. Fleschner,* 568 F.2d 862, 868 (2d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978), *disapproved on other grounds, Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979)); *accord Interbrew v. Edperbrascan Corp.,* 23 F.Supp.2d 425, 431 (S.D.N.Y.1998).

In *Blue Chip,* the Supreme Court held that a plaintiff was not entitled to sue for a violation of Rule 10b–5 on the theory that it was entitled to buy certain stock pursuant to an antitrust consent decree to which the plaintiff was not a party, but was dissuaded from doing so by reason of a materially misleading, overly pessimistic prospectus. In reaching that holding, the Court expressed its agreement with the Second Circuit's earlier ruling in *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), which held that a person who is neither a purchaser nor a seller of securities may not bring an action under § 10(b) or Rule 10b–5. The Court also noted that "[t]hree principal classes of potential plaintiffs are presently barred by the *Birnbaum* rule," one of which is "actual shareholders in the issuer who allege that they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material." 421 U.S. at 737–38, 95 S.Ct. 1917.[2] Although recognizing that there are some disadvantages to such a rule, the Court stated that

> [t]he virtue of the *Birnbaum* rule, simply stated, ... is that it limits the class of plaintiffs to those who have at least

dealt in the security to which the prospectus, representation, or omission relates. And their dealing in the security, whether by way of purchase or sale, will generally be an objectively demonstrable fact in an area of the law otherwise very much dependent upon oral testimony. In the absence of the *Birnbaum* doctrine, bystanders to the securities marketing process could await developments on the sidelines without risk, claiming that inaccuracies in disclosure caused nonselling in a falling market and that unduly pessimistic predictions by the issuer followed by a rising market caused them to allow retrospectively golden opportunities to pass.

*Id.* at 746–47, 95 S.Ct. 1917.

Following *Blue Chip,* the Second Circuit has made clear that "the requirement of fraud in connection with the purchase or sale of a security is not satisfied by an allegation that plaintiffs were induced fraudulently not to sell their securities." *Abrahamson,* 568 F.2d at 868 (citing *Blue Chip,* 421 U.S. at 737–38, 95 S.Ct. 1917).

In opposition to defendant's motion, plaintiff cites *Marbury Management, Inc. v. Kohn,* 629 F.2d 705 (2d Cir.), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980), in which the Second Circuit held that false statements made by the defendant, a brokerage firm trainee, to the effect that he was a broker and portfolio management specialist, were actionable under § 10(b) and Rule 10b–5 based on the plaintiffs' allegation that the defendant's statements induced them to purchase and retain certain securities, which

---

**2.** The other two classes are "potential purchasers of shares ... who allege that they decided not to purchase because of an unduly gloomy representation or the omission of favorable material which made the issuer appear to be a less favorable investment vehicle

than it actually was," and "shareholders, creditors, and perhaps others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b–5." *Id.*

declined in value while the plaintiffs held them.

The court's holding in *Marbury*, however, does not help plaintiff in the case at bar. Though the court did state that the plaintiffs' retention of the securities at issue affected the amount of their damages, *id.* at 708, the court did not even *suggest* that retention alone could give rise to a § 10(b) or Rule 10b–5 claim. Indeed, the court specifically stated that "the claim is . . . one within Section 10(b) and Rule 10b–5 because the representation relied upon was made in connection with the *purchase* of securities, and both Marbury and Bader sue as *purchasers* of securities." *Id.* at 710 (emphasis added). The court also accepted the district court's finding in *Marbury* that the defendant's misrepresentations had caused the plaintiffs not only to retain their securities, but to purchase those securities from the defendant in the first place. *Id.* at 707. The court also noted that "[t]he case is *not* one in which nothing has been shown except an *inducement to hold.* . . ." *Id.* (emphasis added).

It is clear, then, that an allegation that the plaintiff *retained* his securities in reliance on the defendant's representations or advice, without more, is insufficient to satisfy the requirement that the violation be "in connection with the purchase or sale of a security." *Krim*, 989 F.2d at 1443; *Gambella v. Guardian Investor Services Corp.*, 75 F.Supp.2d 297, 299 (S.D.N.Y. 1999); *Freschi v. Grand Coal Venture*, 551 F.Supp. 1220, 1227 (S.D.N.Y.1982). Since plaintiff does not allege that defendants' alleged violations were in any way connected with his purchase or sale of securities, but only with his continued retention of them, plaintiff's claims under § 10(b) and Rule 10b–5 must be dismissed as well.[3]

## IV. Claim under § 20(a) of the Act

■ In his fourth cause of action, which is asserted against defendant SSB only, plaintiff alleges a violation of § 20(a) of the Act, 15 U.S.C. § 78t(a). Section 20(a) provides for joint and several liability on the part of "[e]very person who, directly or indirectly, controls any person liable under" the Act, "with and to the same extent as such controlled person to any person to whom such controlled person is liable," with certain exceptions where the "controlling person" acted in good faith.

■ "In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998) (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir.1996)); *accord Cyber Media Group, Inc. v. Island Mortgage Network, Inc.*, 183 F.Supp.2d 559, 575 (E.D.N.Y.2002).

---

**3.** At page 3 of his memorandum of law in opposition to defendants' motion, plaintiff states that he acquired his Nortel shares "through the exercise of stock options in a predecessor company," and that "[s]ince it was a relatively large transaction, Plaintiff solicited two broker-dealers with whom he had accounts to obtain the best terms." Plaintiff states that he selected SSB based on their "agreeing on transaction price and by [SSB's] agreeing to provide research and advice on the shares."

Aside from the fact that these factual allegations are not contained in the complaint or in any admissible evidentiary form, they also do not indicate that the alleged violations by defendants had anything to do with plaintiff's decision to purchase the shares in question. Rather, these statements suggest that plaintiff was already of a mind to purchase the shares, and that *he* solicited *SSB* to act as his broker.

Since plaintiff has failed sufficiently to allege a primary violation of the Act by a controlled person, his claim under § 20(a) necessarily fails as well, and must be dismissed. *See, e.g., Roer v. Oxbridge Inc.,* 198 F.Supp.2d 212, 231 (E.D.N.Y.2001); *Hinerfeld v. United Auto Group,* No. 97 Civ. 3533, 1998 WL 397852, *8 (S.D.N.Y. July 15, 1998) (Where underlying securities claims are dismissed for failure to state a claim, "there can be no control person liability under [the Act]").

## V. State Law Claims

■ Plaintiff's fifth and sixth causes of action assert claims under New York law, pursuant to this court's supplemental jurisdiction under 28 U.S.C. § 1367(c). Since plaintiff's federal claims have been dismissed for failure to state a claim, I decline to exercise jurisdiction over his state law claims, and they are dismissed. *See Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 104 (2d Cir.1990) ("It is well settled that 'if the federal claims are dismissed before trial … the state claims should be dismissed as well'") (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)).

## CONCLUSION

Defendants' motion to dismiss the complaint (Docket Item 8) is granted, and the complaint is dismissed.

IT IS SO ORDERED.